1
2
3
4
5
6
7

KAREN MATTESON, Cal. Bar No. 102103
Email: mattesonk@sec.gov
DAVID J. VAN HAVERMAAT, Cal. Bar No. 175761
Email: vanhavermaatd@sec.gov

Attorney for Plaintiff
Securities and Exchange Commission
John W. Berry, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>JOHN THORNES,<br><br>　　　　　Defendant,<br><br>CHRISTOPHER BURNELL; KYLE LARICK; and DOREEN THORNES,<br><br>　　　　Relief Defendants. | Case No. 5:14-cv-01598-RGK-SP<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY PLAINTIFF SEC AGAINST RELIEF DEFENDANTS BURNELL, LARICK AND D. THORNES**<br><br>Date: June 22, 2015<br>Time: 9:00 a.m.<br>Place: Courtroom 850 (Roybal)<br>　　　　(Hon. R. Gary Klausner) |

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................. 1

II.   STATEMENT OF FACTS ............................................................................... 2

    A.   Defendant Thornes Misappropriated Investor Funds................................ 2

    B.   The Relief Defendants Received Ill-Gotten Gains to which they had No Legitimate Claim .................................................................................... 4

        1.   Thornes Transferred Ill-Gotten Gains to Burnell ............................ 4

        2.   Thornes Transferred Ill-Gotten Gains to Larick .............................. 5

        3.   Thornes Caused D. Thornes to Receive Ill-Gotten Gains ............... 6

III.  ARGUMENT.................................................................................................... 7

    A.   Defendant Thornes Violated the Antifraud Provisions............................. 7

    B.   The Relief Defendants Received Ill-Gotten Gains to which they had No Legitimate Claim .................................................................................. 10

        1.   Relief Defendant Burnell Has No Legitimate Claim to the $3,071,112.90 in Ill-Gotten Gains He Received............................ 10

        2.   Relief Defendant Larick Has No Legitimate Claim to the $893,000 in Ill-Gotten Gains He Received.................................... 11

        3.   Relief Defendant D. Thornes Has No Legitimate Claim to the $85,199.92 in Ill-Gotten Gains She Received ................................ 14

    C.   The SEC is Entitled to Disgorgement from the Relief Defendants on a Joint and Several Basis with Defendant Thornes, Together with Prejudgment Interest................................................................................. 16

IV.  CONCLUSION.............................................................................................. 17

i

# TABLE OF AUTHORITIES

## CASES

*Aaron v. SEC*
   446 U.S. 680 (1980)..................................................................8

*Celotex Corp. v. Catrett*
   477 U.S. 317 (1986)..................................................................7

*In re Sherman*
   491 F.3d 948 (9th Cir. 2007) ...................................................15

*SEC v. Antar*
   831 F. Supp. 380 (D.N.J. 1993)...............................................15

*SEC v. Benson*
   657 F. Supp. 1122 (S.D.N.Y. 1987) .........................................11

*SEC v. Cavanagh*
   155 F.3d 129 (2d Cir. 1998) ............................................. 13, 15

*SEC v. Colello*
   139 F.3d 674 (9th Cir. 1998) .......................................... 1, 10, 11

*SEC v. Dain Rauscher, Inc.*
   254 F.3d 852 (9th Cir. 2001) .....................................................8

*SEC v. First Pacific Bancorp*
   142 F.3d 1186 (9th Cir. 1998) .................................................17

*SEC v. George*
   426 F.3d 786 (6th Cir. 2005) ...................................................13

*SEC v. JT Wallenbrock & Associates*
   440 F.3d 1109 (9th Cir. 2006) .................................................17

*SEC v. Platforms Wireless Int'l Corp.*
   617 F. 3d 1072 (9th Cir. 2010) ................................................17

*SEC v. The Better Life Club of America, Inc.*
   995 F. Supp. 167 (D.D.C. 1998)...............................................13

*SEC v. Vassallo*
   2012 U.S. Dist. LEXIS 71301 (E.D. Cal. May 22, 2012)...........12

*SEC v. Zandford*
   535 U.S. 813 (2002)................................................................7, 8

## Securities Act of 1933

Section 17(a)
   [15 U.S.C. § 77q(a)] ..............................................................7, 8

**Securities Exchange Act of 1934**

Section 10(b)
  [15 U.S.C. § 78j(b)] .................................................................7, 8

**FEDERAL REGULATIONS**

Rule 10b-5
  [17 C.F.R. § 240.10b-5].............................................................7, 8

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 56(a)....................................................................7

# I.     __INTRODUCTION__

This action was brought by Plaintiff Securities and Exchange Commission ("SEC") alleging that Defendant John Thornes ("Thornes"), through his brokerage firm, engaged in a fraudulent scheme by which he misappropriated millions of dollars in investor funds from two client accounts.  He obtained the funds he misappropriated by selling securities and obtaining margin loans collateralized by securities in the accounts.

The SEC further alleges that Thornes transferred fraudulently obtained funds to three individuals,, Christopher Burnell ("Burnell"), Kyle Larick ("Larick") and Doreen Thornes ("D. Thornes").  The SEC named Burnell, Larick and D. Thornes as Relief Defendants in order to effect full relief in the marshalling of assets that are the fruit of the underlying fraud by Thornes.  *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998).

At the time the action was filed, Thornes consented to entry of a final judgment of permanent injunction and other relief. (Dkt. No. 4.)  However, the Court declined to enter the consented-to final judgment "while claims against the Relief Defendants remain unresolved," and stated that it would enter final judgment upon receipt of a proposed judgment resolving all claims against each defendant.  (Dkt. No. 8 (Order re: Plaintiff's Proposed Final Judgment).)

The SEC now moves for summary judgment against each of the three Relief Defendants in this action based on uncontroverted facts establishing that the Relief Defendants: (1) received ill-gotten funds; and (2) do not have any legitimate claim to those funds.  *See Colello*, 139 F.3d at 677.  As the Ninth Circuit explained in *Colello*, the broad equitable powers of the federal courts can be employed to recover ill-gotten gains for the benefit of the victims of wrongdoing, whether held by the original wrongdoer or by one who has received the proceeds after the wrong.  The SEC seeks summary judgment that Burnell, Larick and D. Thornes received ill-gotten funds to which they have no legitimate claim, and a Final Judgment requiring that they

disgorge those funds on a joint and several basis with Thornes, together with prejudgment interest.

## II.    **STATEMENT OF FACTS**

Plaintiff SEC has submitted a separate Statement of Uncontroverted Facts ("Facts") which sets forth in detail Thornes' fraud and the Relief Defendants' receipt of ill-gotten gains from the fraud.  As summarized below, the Facts show that Thornes, who operated an SEC registered broker-dealer, misappropriated from two client accounts millions of dollars derived from sales of securities and margin loans in violation of the antifraud provisions of the federal securities laws, and transferred much of those ill-gotten funds to the three Relief Defendants.  Because the Relief Defendants had no legitimate claim to the funds, they should be ordered to disgorge them.

### A.    **Defendant Thornes Misappropriated Investor Funds**

Thornes misappropriated funds from two brokerage accounts for which he was the registered representative.  The first account, the Shultz Trust Account, had been created for the benefit of Ms. Shultz, who during the relevant period was a dementia patient receiving 24 hour nursing care.  Thornes was trustee over this account.  (Facts ¶ 9.)  The second account, the Harbison Trust Account, had been created by the will of a Thornes family friend for the purpose of funding scholarships.  During the relevant period, Relief Defendant D. Thornes, Thornes' mother, was the trustee over this account.  (Facts ¶ 17.)

Thornes caused millions of dollars of unsecured payments to be made to Burnell from the two accounts, purportedly based solely on representations from Larick that Burnell had a lending program that produced returns of 15-20%.  In doing so, Thornes did not inquire into Burnell's financial background.  (Facts ¶ 5.)  Nor was there any documentation supporting that the transfers to Burnell were loans to Burnell, or that the monies were being invested in property or securities.  The monies also were not secured and no collateral was given by Burnell.  (Facts ¶ 11.)  Almost

2

$1.5 million of these payments to Burnell were made in the form of cashier's checks payable to the San Manuel Casino. (Facts ¶¶ 10, 11, 18 & 20.) Records from the San Manuel Casino unequivocally establish that Burnell cashed every one of these checks. (Facts ¶¶ 11 & 20.)

Thornes also caused $893,000 in unsecured payments to be made to his close friend, Larick, from the Harbison account knowing Larick would use $800,000 to purchase a vacation home and $93,000 to purchase a luxury automobile. (Facts ¶¶ 25-33.)

Finally, Thornes caused his mother, D. Thornes, to receive trustee fees in excess of the amount allowed by the formula set forth in the Harbison Will. (Facts ¶ 34-41.) She received $85,199.22 in excess fees to which she was not entitled. (Facts ¶ 41.)[1]

In order to make the payments to Burnell and Larick, Thornes liquidated securities in the Shultz and Harbison accounts. The sales from the Harbison account were not authorized by D. Thornes, its trustee. (Facts ¶¶ 12, 21 & 23.)

In addition to acting knowingly in transferring the $893,000 to Larick, Thornes acted at least recklessly in making the unsecured payments to Burnell because Thornes was placed on notice several times that Burnell was engaged in questionable financial activity, and learned facts that indicated that it was unlikely that funds could be collected from Burnell in the future. First, on June 6, 2011, a money laundering Compliance Consultant for Wells Fargo, an affiliate of the clearing broker for Thornes' brokerage firm, sent an email to Thornes asking him to address questions concerning the transfers to Burnell from the two accounts, and the transfers to Larick

---

[1] This amount is slightly less than the amount of $85,570 alleged in paragraph 29 of the Complaint because the correct amount of trustee fees is one percent of the average net value of the principal of the trust during a given year, and subsequent to the filing of the Complaint, D. Thornes' counsel notified the SEC of an additional small bank account that the SEC believes should be included in the trust assets. The trust assets were thus slightly more than originally calculated, rendering the overpayment of fees to D. Thornes slightly less than originally alleged.

from the Harbison account; in response, on June 28, 2011, Thornes acknowledged that the "loans" to Burnell were "most likely outside of the investment objectives of the client [Shultz]." (Facts ¶ 13(a).) Thornes nevertheless continued to make the transfers to Burnell for another eighteen months, through January 2013. (*See id.*) Subsequently, in April 2012, Thornes received notice from the clearing firm that Burnell had written checks on an account into which he had deposited no funds; Burnell's check to cover those checks bounced; Burnell showed Thornes a copy of an IRS lien imposed on him; and Burnell directed Burnell to an internet posting accusing Burnell of perpetrating a "massive investment fraud scheme," and "a classic Ponzi scheme." (Facts ¶ 13.b.) Thornes nevertheless continued to transfer hundreds of thousands of dollars in cashier's checks to Burnell.

In order to transfer funds from the Harbison account to Burnell and Larick, Thornes persuaded his mother, D. Thornes, to sign checks from the Harbison Account that were completely blank – they included no date, payee or amount. (Facts ¶ 37.) These blank checks signed by D. Thornes were the source of payment, including by cashier's check, to Burnell and Larick. (Facts ¶¶ 21, 23.) Thornes caused D. Thornes to be paid $4,000 per month in trustee fees, even after the value of the Harbison Account fell to the point that these fees greatly exceeded the fees owed to D. Thornes pursuant to the formula in the Harbison Will. (Facts ¶¶ 38-40.) D. Thornes received $85,199.92 more than she was entitled to in trustee fees pursuant to the Harbison Will. (Facts ¶ 41.)

## B. The Relief Defendants Received Ill-Gotten Gains to which they had No Legitimate Claim

It is undisputed that Thornes misappropriated funds from the Shultz and Harbison accounts and that Burnell, Larick and D. Thornes had no legitimate claim to them.

### 1. Thornes Transferred Ill-Gotten Gains to Burnell

Burnell received $3,071,112.90 in investor funds fraudulently misappropriated

4

by Thornes, $1,470,827 of which was in cashier's checks payable to the San Manuel Casino, which Burnell cashed.  (Facts ¶¶ 10, 18, 20.)  Another $350,000 was paid to Burnell on January 5, 2011, by Larick, who had received Harbison Account funds earlier that day from Thornes.  (Facts ¶ 19.)  Thornes caused an additional $67,443.90 to be wire transferred to The Early Air Way, purportedly for medical transport of Burnell's wife.  (Facts ¶¶ 10 & 11.)  No consideration was paid by Burnell; he never repaid the funds he received from either the Shultz or Harbison Trusts.  (Facts ¶¶ 8 & 15.)

   As explained, Thornes admitted that the transfers from the Shultz account were inconsistent with the objectives of that account.  Similarly, the transfers from the Harbison account were, on their face, inconsistent with the objective of that account to fund scholarships.  (Facts ¶ 24.)

   There is no evidence that Burnell provided any services in exchange for the funds or otherwise had a legitimate claim to them.  (Facts ¶¶ 5, 11.)  Instead, Burnell accepted almost half of the funds as cashier's checks payable to the San Manuel Casino, which he cashed; received other funds as wire transfers into his personal checking account, the statements for which do not evidence the funds were invested on behalf of the Shultz or Harbison Trusts; and used the funds to pay for medical transport for his wife.  Burnell has not returned any of the funds.  (Facts ¶ 8.)

### 2.   Thornes Transferred Ill-Gotten Gains to Larick

   At the time of the fraud, Larick had known Thornes for about twenty years, and he and Thornes were friends.  (Facts ¶ 2.)  When Thornes made the $800,000 and $93,000 transfers to Larick, they both knew Larick was going to purchase a vacation home with the $800,000, and a luxury automobile with the $93,000.  (Facts ¶¶ 26-32.)  Larick accepted the monies not knowing the nature of the Harbison Account, or that the Harbison Account was the source of the monies.  (Facts ¶ 26.)  Larick did understand, however, that he was to pay no interest on the $800,000 and that he "had no responsibility for that $800,000."  (Facts ¶ 28.)  Larick similarly did not know that

the Harbison Account was the source of the $93,000, and also did not consider that payment to be a loan.  (Facts ¶ 31.)  Larick never repaid the $893,000 to the Harbison Trust, except for a nominal payment of $20,000 he made to settle a subsequent lawsuit brought by the Harbison Trust.  (Facts ¶ 33.)

In short, the $893,000 in transfers were gifts by Thornes to his long-time friend, Larick, who paid no consideration for the transfers and believed he had no obligation to repay the funds.

### 3.    Thornes Caused D. Thornes to Receive Ill-Gotten Gains

The only service D. Thornes provided as trustee for the Harbison Trust was to sign checks.  (Facts ¶ 37.)  As explained, the checks she signed were entirely blank. (*Id.*)  Thornes caused his mother to receive $4,000 per month in purported trustee fees from the Harbison Account throughout the relevant period.  (Facts ¶ 34.)  These monthly fees exceeded the one percent average value of the Trust permitted to be paid in fees by a total of $85,199.92.  (Facts ¶ 41.)

D. Thornes herself knew that her fees should "[a]bsolutely" have been reduced as the value of the account dropped.  (Facts ¶ 35.)  However, she simply viewed the fees as "just part of my income that I lived on" after her husband's death.  (Facts ¶ 38.)  She "didn't know anything that was going on" with the Harbison Account over which she was trustee, and "had no idea" Thornes was loaning money to others from the account.  (Facts ¶ 36.)  She performed none of the duties that the Harbison Will provided that the trustee was to perform; nor did she receive monthly brokerage statements for the account or know how much money was in the account at any given time.  (Facts ¶¶ 22 & 37.)

Because, as she specifically admits, she performed no extraordinary services as Trustee (Facts ¶ 39), D. Thornes had no legitimate claim to the Trustee fees Thornes caused her to receive that were in excess of the amount provided for by the formula in the Harbison Will.

**III.   ARGUMENT**

Summary judgment is appropriate when the pleadings, affidavits, and other supporting papers permitted by Rule 56 of the Federal Rules of Civil Procedure demonstrate that there is no genuine issue of material fact, and the moving party is entitled to prevail as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  As set forth below, the undisputed facts, established primarily by admissions by Thornes and Relief Defendants Larick and D. Thornes, supported by documentary evidence, demonstrate that Thornes violated the antifraud provisions of the federal securities laws and that the Relief Defendants received ill-gotten gains as a result of Thornes' fraud. Additionally, the SEC is entitled to an adverse inference against Relief Defendant Burnell, who asserted his Fifth Amendment privilege in lieu of answering questions during the SEC's investigation, and who similarly asserted his Fifth Amendment privilege throughout his Answer.

As further explained, the SEC is entitled to a Judgment against the Relief Defendants ordering them to disgorge their ill-gotten gains on a joint and several basis with Thornes.

**A.      Defendant Thornes Violated the Antifraud Provisions**

Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), prohibits fraud in the offer or sale of securities, and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, prohibit fraud in connection with the purchase or sale of any security.  Thornes' sale of securities and obtaining margin loans from the Shultz and Harbison accounts together with his misappropriation of the proceeds of those securities sales violated Section 17(a)(1) of the Securities Act and Section 10(b) and Rules 10b-5(a) and (c) thereunder.  *See SEC v. Zandford*, 535 U.S. 813, 122 S. Ct. 1899, 153 L. Ed. 2d 1 (2002).  Rule 10b-5 provides in relevant part that:

7

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

> (a)    To employ any device, scheme or artifice to defraud,
> . . . or
>
> (c)    To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

Section 17(a)(1) of the Securities Act, like Exchange Act Rule 10b-5(a), prohibits employment of "any device, scheme, or artifice to defraud."

Under facts very similar to those in this case, the Supreme Court held that a broker's unauthorized sales of his customer's securities without the customer's knowledge, and subsequent misappropriation of the proceeds for his own benefit, constituted violations of Section 10(b) and Rule 10b-5.  In so holding, the Court explained that: "In the aggregate, the sales are properly viewed as a 'course of business' that operated as a fraud or deceit on a stockbroker's customer," as well as a "scheme to defraud." *Zandford*, 535 U.S. at 820-22.  Thornes' sale of securities from the Shultz and Harbison accounts together with his misappropriation of the proceeds of those securities sales thus constituted employment of a "device, scheme or artifice to defraud," as well as "act[s], practice[s], or [a] course of business which operate[d] . . . as a fraud or deceit," in violation of Section 17(a)(1), and Rules 10b-5(a) and (c).

Violations of Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder require proof of scienter.  *See SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001), *citing Aaron v. SEC*, 446 U.S. 680, 701-02, 100 S. Ct. 1945, 64 L. Ed. 2d 611 (1980).  Scienter is satisfied by proof of recklessness.  Reckless conduct is:

> conduct that consists of a highly unreasonable act, or omission, that is an "extreme departure from the standards of ordinary care, and which

8

1    presents a danger of misleading buyers or sellers that is either known to

2    the defendant or is so obvious that the actor must have been aware of it."

3  *Id.* (citations omitted).

4    There is no question that Thornes' sales of securities and misappropriation of

5  the proceeds were, at a minimum, reckless.  As set forth above, in addition to failing

6  to secure any purported "loans" to Burnell, Thornes was repeatedly put on notice that

7  Burnell was in financial difficulty.  Thornes also specifically acknowledged in

8  writing early in the course of his scheme in July 2011 that the "loans" to Burnell were

9  "most likely outside of the investment objectives of the client [Shultz]."  He

10  nevertheless continued to sell securities and transfer millions in proceeds to Burnell

11  for another eighteen months, through at least January 2013.  This conduct was

12  additionally reckless because, assuming that Thornes thought he was "investing"

13  investor monies with Burnell, he failed to document the "investments" or otherwise

14  secure them.

15    Thornes also acted with scienter in transferring misappropriated investor funds

16  to his long-time friend Larick.  Indeed, Thornes acted knowingly in making these

17  transfers because he knew that Larick was going to use the $800,000 transfer to

18  purchase a vacation home, and the $93,000 transfer to purchase a luxury automobile,

19  and neither of these expenditures by Larick had any discernible benefit for the

20  Harbison Trust.  Thornes did not even attempt to obtain security for these transfers,

21  which appear to have simply been gifts to Larick at the expense of the Harbison

22  Trust.

23    Thornes also acted knowingly with respect to transfers of trustee fees to his

24  mother, D. Thornes.  He had her sign otherwise completely blank checks which he

25  used to misappropriate funds that he transferred to Burnell and Larick, and provided

26  no account statements to her. He then paid her off with what she viewed as "just part

27  of my income that I lived on" in the form of $4,000 monthly payments denominated

28  "trustee fees" which exceeded any such fees to which she was entitled under the

1  Harbison Will.

2    **B.    The Relief Defendants Received Ill-Gotten Gains to which they had**

3          **No Legitimate Claim**

4        The broad equitable powers of this Court may be employed to recover ill-

5  gotten gains from illegal conduct, whether held by the original wrongdoer or by one

6  who has received the proceeds after the wrong, as did Burnell, Larick and D.

7  Thornes.  *See Colello*, 139 F.3d at 676.  The SEC named Burnell, Larick and D.

8  Thornes as relief, or nominal, defendants, to recover ill-gotten gains they received

9  after Thornes misappropriated proceeds from securities sales and margin loans for the

10 Shultz and Harbison accounts and transferred the proceeds to them.  *See id.*

11       In the typical case, the SEC must prove two elements to recover ill-gotten gains

12 from a relief defendant:  (1) that the relief defendant has received ill-gotten funds;

13 and (2) that the relief defendant does not have a legitimate claim to the funds.  *Id.* at

14 677.  As set forth above, the facts are undisputed as to the first element – the funds

15 Thornes transferred to each of the Relief Defendants were ill-gotten monies he

16 obtained as a result of his fraud.  As explained below, the undisputed facts also

17 establish the second element – that none of the Relief Defendants had a legitimate

18 claim to the funds received from the Shultz or Harbison Accounts.

19    **1.    Relief Defendant Burnell Has No Legitimate Claim to the**

20          **$3,071,112.90 in Ill-Gotten Gains He Received**

21       Burnell received over $3 million dollars in ill-gotten gains, almost half of

22 which was in the form of cashier's checks made out to the San Manuel Casino, which

23 he cashed.  There is no evidence that he provided any services or consideration in

24 exchange for these cashier's checks.  Rather than explain what he did with the

25 investor funds misappropriated by Thornes which he received, or what services he

26 provided in exchange for them, Burnell asserted his Fifth Amendment privilege

27 against self-incrimination, both when the SEC asked him questions during its

28 investigation and in his Answer in this lawsuit.

*Colello* involved a relief defendant similarly situated to Burnell.  In *Colello*, the relief defendant also asserted his Fifth Amendment privilege instead of answering questions regarding his receipt of monies the defendants had fraudulently obtained from investors.  As the Ninth Circuit explained in affirming the grant of summary judgment against Colello, parties are free to invoke the Fifth Amendment in civil cases, but the district court is equally free to draw adverse inferences from their failure of proof.  *Colello*, 139 F.3d at 677.  In this case, it is appropriate for the Court to draw an adverse inference from Burnell's assertion of his Fifth Amendment privilege, and to bar Burnell from introducing evidence precluding summary judgment against him.  *See id.* at 678, *quoting SEC v. Benson*, 657 F. Supp. 1122, 1129 (S.D.N.Y. 1987): "By his initial obstruction of discovery and his subsequent assertion of the privilege, defendant has forfeited the right to offer evidence disputing the plaintiff's evidence or supporting his own denials."  Here, as in *Colello*, the SEC has presented evidence against Burnell supporting summary judgment in addition to seeking an adverse inference based on his assertion of the privilege.  Summary judgment should accordingly be granted, and Burnell should be ordered to disgorge his ill-gotten gains.

## 2.   Relief Defendant Larick Has No Legitimate Claim to the $893,000 in Ill-Gotten Gains He Received

Unlike Burnell, Larick testified in the SEC's investigation and admitted in his Answer the SEC's allegations regarding his receipt and use of the $893,000 he received from Thornes.

Larick admits he spent $800,000 he received from Thornes on a vacation home.  Indeed, both he and Thornes testified that pursuant to his instructions, Thornes sent most of the funds directly to the escrow account created for the purpose of purchasing that vacation home.  Both he and Thornes similarly admit that Thornes gave Larick the $93,000 to purchase a luxury automobile.

Obviously, purchase by Larick of a vacation home and a luxury automobile did

not constitute provision of any kind of service to the Harbison Trust.  Larick admits that he did not view these funds as a loan, or believe that he had any responsibility for them.  In other words, they were a gift from Thornes – of monies that belonged to the Harbison Trust.

The SEC understands that Larick claims that he viewed the $893,000 as monies he was owed by Burnell on investments he made with Burnell.  But the monies did not come from Burnell.  They came from the Harbison Trust.  What Larick may have thought is irrelevant – he provided no consideration or services to the Harbison Trust for its monies, which Thornes so generously gave to him.  Relief defendants in other cases who have made claims similar to Larick have nevertheless been held liable because, like Larick, they had no legitimate claim to the investor monies they received.

For example, in *SEC v. Vassallo*, 2012 U.S. Dist. LEXIS 71301 (E.D. Cal. May 22, 2012), the principal of the entity relief defendant claimed that the relief defendant had provided value to the entity in receivership in exchange for the $100,000 in investor monies it had received by investing $18,000 in the receivership entity, and that the $100,000 was a return on its investment.  *Id.* *4-5.  In fact, no money had gone to the receivership entity; the $18,000 was instead transferred to a different entity at the defendant's direction.  *Id.* at *5.  The district court found that the relief defendant's claim that it was a victim of the defendant was not relevant; it was undisputed that the relief defendant provided nothing of value to the receivership entity, even if it did invest $18,000 in a different entity at the direction of the defendant.  *Id.* at *6.  The court similarly determined that additional elaborate explanations by the relief defendant's principal concerning additional transfers between the relief defendant, another entity controlled by the relief defendant's principal, and the different entity controlled by the defendant were not relevant "since it is undisputed that none of these companies used the alleged $198,000. . . to benefit [the entity in receivership] in any way."  *Id.* at *6-7 n.8.  The entity relief defendant

12

1  was thus held liable for the entire $100,000 it received, and ordered to disgorge it to

2  the receiver.  *Id.* at *14-15.

3      Similarly, in *SEC v. The Better Life Club of America, Inc.*, 995 F. Supp. 167

4  (D.D.C. 1998), the relief defendant argued that a $7500 cashier's check she received

5  from the defendant was repayment of a loan she had made to the defendant.  *Id.* at

6  182.  The district court held that, even if it were willing to believe the relief

7  defendant's self-serving assertions that she had made the loan (which was

8  unsupported by any documentation), because it was undisputed that the defendant

9  purchased the cashier's check with investor funds and it was also undisputed that the

10  investors received no value on the loan, the $7500 was subject to disgorgement.  *Id.*

11  The district court also held that, to the extent that the relief defendant's joint

12  ownership interest in the house she co-owned with the defendant and the automobile

13  he had purchased for her were gifts to her by the defendant purchased with investor

14  funds, those interests were subject to disgorgement.  *See id.* at 183-84.  This ruling is

15  consistent with other cases that have held that gifts of fraudulently obtained investor

16  funds are subject to disgorgement by relief defendants.  For example, in *SEC v.*

17  *George*, 426 F.3d 786, (6th Cir. 2005), the Sixth Circuit held that because the

18  defendant obtained the money through fraud and gave it to the relief defendant as a

19  gift, the relief defendant had no legitimate claim to the funds, explaining that:

20      [T]o hold otherwise "would allow almost any defendant to circumvent

21      the SEC's power to recapture fraud proceeds[] by the simple procedure

22      of giving [the proceeds] to friends and relatives, without even their

23      knowledge."

24  426 F.3d at 798, *quoting SEC v. Cavanagh*, 155 F.3d 129, 137 (2d Cir. 1998).

25      Larick accordingly has no legitimate claim to the $893,000 in investor funds he

26  received.  He provided no services in exchange for the monies.  No benefit was

27  conferred on the Harbison Trust as a result of the transfer of its monies to him.

28  Finally, to the extent the monies were a gift conferred by Thornes, they were a gift of

1    funds that belonged to the Harbison Trust, not Thornes. Accordingly, the $893,000

2    should be ordered disgorged.

3             **3.      Relief Defendant D. Thornes Has No Legitimate Claim to the**

4                    **$85,199.92 in Ill-Gotten Gains She Received**

5         The Harbison Will sets forth a clear formula for calculation of fees to be paid

6    to the trustee of the Harbison Trust:

7           one percent of the average net value of the principal of the trust estate

8           during each calendar year for all ordinary services rendered by the trustee

9           and to reasonable additional compensation for any extraordinary services

10           rendered by the trustee.

11         The only service that D. Thornes provided was signing the completely blank

12    checks her son instructed her to sign. She performed no other services – she did not

13    even monitor the balances in the Trust's accounts. But even assuming signing blank

14    checks at Thornes' direction this was enough to justify D. Thornes' receipt of the 1%

15    fee – a generous assumption – D. Thornes was overpaid $85,199.92 in excess of what

16    was permitted by the Harbison Will. She has no legitimate claim to this excess

17    payment. D. Thornes admits she provided no extraordinary services, and never

18    requested compensation for extraordinary services. Thus, under the will, she was

19    allowed a 1% fee calculated pursuant to the above formula, and no more. In fact, she

20    admits she understood that she was receiving $4,000 per month in trustee fees during

21    the relevant period, and that she understood that, as the value of the account dropped,

22    her fees should "[a]bsolutely" have been reduced accordingly.

23         D. Thornes simply viewed the $4,000 she received in monthly trustee fees as

24    "just part of my income that I lived on" after the death of her husband, who had

25    previously been trustee and who persuaded her to agree to succeed him. This, of

26    course, ignores that the fees came out of the Trust, and she was not entitled to more

27    than the amount permitted by the Harbison Will.

28         It is not uncommon for relief defendants who are family members of the

defendant to claim that they have valid ownership of fraud proceeds they unknowingly received.  As explained above with regard to Larick's receipt of Harbison Trust monies from his friend Thornes, which he used to purchase a vacation home and a luxury automobile, receipt of a gift of fraudulently obtained funds, even if unknowing, does not confer on the recipient a legitimate claim to those funds. Such claims have been repeatedly rejected by the courts.  *See SEC v. Cavanagh*, 155 F.3d at 137 (rejecting stock ownership claim by relief defendant wife of defendant, who admitted under oath that she did not know that she had received the stock her husband fraudulently obtained until after the SEC had filed suit); *SEC v. Antar*, 831 F. Supp. 380, 401 (D.N.J. 1993) (disgorgement of illegal profits defendant placed in relief defendant wife's accounts without her knowledge ordered disgorged).  As the court explained in *Antar*, to allow relief or nominal defendants to keep illegal proceeds "would give potential violators a blueprint for pursuing 'estate planning' through securities fraud."  *Id.*  Thornes' apparent similar plan to ensure a monthly income for his mother through excess payments of trustee fees from an account he had illegally plundered does not confer on D. Thornes a legitimate claim to those excess fees.

Any claim by D. Thornes that she is entitled to keep the excess trustee fees is also similar to the rejected claim by a defense attorney in an SEC action that he was entitled to keep fees he received in excess of the amount permitted by his fee agreement.  In *In re Sherman*, 491 F.3d 948 (9th Cir. 2007), an attorney received and retained funds as an advance on a contingency fee.  The court-appointed receiver for the entity defendants, which had been Sherman's clients, instructed Sherman to return the funds exceeding the amount authorized by the fee agreement, which funds were originally received by the entities from defrauded investors; when Sherman did not comply, the Receiver, joined by the SEC, moved for disgorgement.  *Id.* at 954-55. The Ninth Circuit concluded that Sherman "was effectively acting as a depository for those funds, as he legitimately obtained them in the first place but no longer had a

valid claim to retain them," and that he thus could be ordered to disgorge the money retained in excess of this fee for the service rendered in the contingency lawsuits. *Id.* at 959.

This case is more straightforward than *Sherman*, which involved looking at State Bar rules to determine the circumstances under which an attorney must return advances received under a contingent fee agreement. The Harbison Will prescribes a formula for calculating trustee fees for each year. D. Thornes received trustee fees derived from investor funds that exceeded the amounts allowed by the formula. She should be ordered to disgorge them.

## C. The SEC is Entitled to Disgorgement from the Relief Defendants on a Joint and Several Basis with Defendant Thornes, Together with Prejudgment Interest

Previously, Thornes consented to entry of a final judgment against him. (Dkt. No. 4.) The Court, however, declined to enter the consented-to final judgment "while claims against the Relief Defendants remain unresolved," and stated that it would enter final judgment upon receipt of a proposed judgment resolving all claims against each defendant. (Dkt No. 8 (Order re: Plaintiff's Proposed Final Judgment).) Among other relief, Thornes consented to pay $4,366,790 in disgorgement. This amount included funds which Thornes received, and then transmitted to the Relief Defendants.[2]

---

[2] The SEC has since discovered additional payments to Burnell as a result of subpoenaing and obtaining documents from the San Manuel Casino. Although the SEC is seeking disgorgement of those additional funds from Burnell, it is not seeking to set aside Thornes' Consent, which the Court has accepted, and which the SEC believes was negotiated in good faith.

It should also be noted that the SEC has not included in this motion against Burnell other payments Thornes claims he made to Burnell (See Matteson Dec. Exs. 13 & 28 (Thornes' summary charts)) for which the sole evidence is Thornes' testimony uncorroborated by bank, casino or other documents or testimony by another witness. These payments are properly included in Thornes' original consented-to disgorgement amount, however, because regardless of whether they went to Burnell, Thornes misappropriated these monies from the Shultz and Harbison Trusts.

Joint and several liability for disgorgement is appropriate "[W]here two or more individuals or entities collaborate or have a close relationship in engaging in the violations of the securities laws." *SEC v. JT Wallenbrock & Associates*, 440 F.3d 1109, 1117 (9th Cir. 2006), *quoting SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998). Nominal or relief defendants may also be subject to joint and several liability for disgorgement. *Id. See also SEC v. Platforms Wireless Int'l Corp.*, 617 F. 3d 1072, 1098 (9th Cir. 2010) (personal financial benefit is not a prerequisite for joint and several liability; it is not inequitable to require the defendant who orchestrated the unlawful transactions and had control of the proceeds jointly to share the burden of restoring the illegally obtained monies, even if he did not allocate them to himself).

Here, although the Relief Defendants did not engage in the violations of the securities laws, their close relationship with Thornes is undisputed. D. Thornes is Thornes' mother. Larick was his long-time close friend. Burnell also enjoyed a close relationship with Thornes, as evidenced by Thornes' willingness to fund Burnell's wife's trip by private jet for medical treatment – albeit with investor monies – and Thornes' repeated transfers of large sums to Burnell by wire transfer and cashier's checks made out to San Manuel Casino. It is accordingly appropriate to hold each of the Relief Defendants jointly and severally liable with Thornes for the amounts they individually received.

Finally, it is appropriate to order that each Relief Defendant pay prejudgment interest. It is appropriate to calculate prejudgment interest based on the tax underpayment rate, because this rate approximates the interest rate the Relief Defendants would have otherwise paid on a comparable unsecured loan. *Platforms Wireless*, 617 F.3d at 1099.

## IV.  <u>CONCLUSION</u>

For the reasons stated, Plaintiff SEC is entitled to summary judgment against each of the Relief Defendants, and a Judgment holding them jointly and severally

1   liable with Thornes for their ill-gotten gains, together with prejudgment interest

2   thereon.

3   Dated:  May 21, 2015                    Respectfully submitted,

4

5                                           /s/Karen Matteson
                                            Karen Matteson
6                                           Attorney for Plaintiff
                                            Securities and Exchange Commission

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE

I am over the age of 18 years and not a party to this action.  My business address is:

> U.S. SECURITIES AND EXCHANGE COMMISSION,
> 444 S. Flower Street, Suite 900, Los Angeles, California 90071
> Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On May 21, 2015, I caused to be served the document entitled **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY PLAINTIFF SEC AGAINST RELIEF DEFENDANTS BURNELL, LARICK AND D. THORNES** on all the parties to this action addressed as stated on the attached service list:

☒ **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐ **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐ **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐ **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐ **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐ **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒ **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐ **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.


Date:  May 21, 2015                    /s/Karen Matteson
                                       _____
                                       Karen Matteson

19

**SEC v. JOHN THORNES, et al.**
**United States District Court—Central District of California**
**Case No. 5:14-cv-01598-RGK-SP**

## SERVICE LIST

Kenneth M. Miller, Esq. **(served by ECF only)**
Ali Matin, Esq. **(served by ECF only)**
Binert, Miller, & Katzman
903 Calle Amanecer, Suite 350
San Clemente, CA 92673
Email:  kmiller@bmkattorneys.com
Email:  amatin@bmkattorneys.com
*Attorneys for Relief Defendant Christopher L. Burnell*


Eric A. Chase, Esq. **(served by U.S. Mail only)**
The Criminal Defense Group
4181 Sunswept Drive, Suite 100
Studio City, CA 91604
Email:  echase@cdgemail.com
*Attorneys for Relief Defendant Kyle W. Larick*


Ethan J. Brown, Esq. **(served by ECF only)**
Jill Glennon, Esq. **(served by U.S. Mail only)**
Ethan Brown Law
100 Wilshire Boulevard, Suite 940
Santa Monica, CA 90401
Email:  ethan@ethanbrownlaw.com
Email:  jill@ethanbrownlaw.com
*Attorneys for Relief Defendant Kyle Larick*


Wilfrid C. Lemann, Esq. **(served by U.S. Mail only)**
David P. Colella, Esq. **(served by ECF only)**
Fullerton, Lemann, Schaefer & Dominick, LLP
215 N. D Street, First Floor, Suite 100
San Bernardino, CA 92401
Email:  blemann@inlandbusinesslaw.com
Email:  dcolella@flsd.com
*Attorneys for Relief Defendant Doreen K. Thornes*


Jonathan Schwartz, Esq. **(served by U.S. Mail only)**
4640 Admiralty Way, Fifth Floor
Marina Del Rey, CA 90202
Email:  nasdlaw@aol.com
*Attorney for Defendant John Thornes*